IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | DR-13-CR-00697(1) |
| | ) | DR-13-CR-00697(2) |
| vs. | ) | |
| | ) | |
| BULMARO SEGURA, | ) | |
| SABRINA SAUCEDO, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER DENYING MOTIONS TO SUPPRESS

Defendants Bulmaro Segura ("Segura") and Sabrina Saucedo ("Saucedo") (collectively, "Defendants") each filed a Motion to Suppress evidence and statements obtained after a traffic stop in Eagle Pass, Texas.  (Dkt. # 38; Dkt. # 39.)  The Court heard argument on September 18, 2013 and again on December 2, 2013.  Assistant United States Attorney Lewis A. Thomas, Esq., appeared at the hearing on behalf of the United States ("the Government"); Gregory D. Torres, Esq., appeared on behalf of Segura, and Louis W. Correa, Esq., appeared on behalf of Saucedo.  After the hearing, the Court ordered all parties to file simultaneous supplemental briefing within fifteen days, and all parties complied.  (Dkt. # 64; Dkt. # 65; Dkt. # 67.)  Upon careful consideration of Defendants' Motions and the

1

testimony at the hearing and upon evaluation of the credibility of the witnesses, the

Court **DENIES** both Motions to Suppress (Dkt. # 38; Dkt. # 39).

BACKGROUND

On April 28, 2013, between 9:30 and 10 p.m., Eagle Pass Police

Detective Joel Perez received an anonymous telephone call from a blocked phone

number to his cell phone. The caller instructed Detective Perez to go to the

intersection of El Indio Highway and Bibb Street to obtain more information on a

narcotics transport. Once Detective Perez arrived at the instructed location, the

caller advised that between 10:00 p.m. and midnight, a male driver would be

transporting narcotics in a maroon Ford F-150 pick-up truck with gold trim and a

tailgate cover. The caller also advised that the driver would be coming from the

Loma Bonita area of Eagle Pass. Detective Perez contacted Eagle Pass Police

Dispatch to relay the information received from the anonymous caller.

Within the hour, Eagle Pass Police observed and stopped two vehicles

matching the general description provided by the anonymous caller. However,

because the first vehicle did not have a tailgate cover, and the second vehicle was

not maroon in color, Detective Perez instructed the Eagle Pass police officers to let

both vehicles go.

Eagle Pass Police Officer Richard Ramirez noticed another maroon

Ford F-150 with gold trim and a tailgate cover in the Loma Bonita area of Eagle

2

Pass shortly after 11:00 p.m.  Defendant Segura was driving the maroon Ford F-150 eastbound on the El Indio Highway coming from the Loma Bonita neighborhood of Eagle Pass.  Officer Ramirez observed Segura fail to stop at a clearly marked stop line, at the intersection of El Indio Highway and Veterans Boulevard, in violation of Texas Transportation Code § 544.007(d).

Officer Ramirez activated his emergency lights and made a traffic stop of Segura's vehicle at approximately 11:05 p.m.  Shortly thereafter, Eagle Pass Police Sergeant Raul Gonzalez arrived at the traffic stop location to assist.  Sergeant Gonzalez has over ten years of investigating narcotics activity and traffic stops.  He also has previously served on the DEA task force.

At 11:09 p.m., Officer Ramirez requested Segura's driver's license and proof of insurance.  Despite Officer Ramirez's instruction, Segura instead produced a passport card.  After Officer Ramirez repeated that he required Segura's driver's license, Segura eventually complied.  Saucedo, however, voluntarily offered her identification without Officer Ramirez requesting it.  Officer Ramirez then conducted a pat down of Segura in front of Sergeant Gonzalez's patrol car.  At 11:10 p.m., Eagle Pass Dispatch informed Officer Ramirez that both licenses returned clear.

While Officer Ramirez was contacting Dispatch to conduct a computer check on Segura and Saucedo's driver's licenses, Sergeant Gonzalez

3

asked Segura who owned the vehicle and where Segura was traveling to.  Segura

responded that the vehicle belonged to his grandfather, and he was coming from

home and going to a hotel.  Sergeant Gonzalez asked for consent to search the

vehicle, but Segura declined, stating, "I don't see why" and "I'm a little paranoid"

because "this is the first time I have ever been stopped."

At 11:13 p.m., Sergeant Gonzalez radioed Dispatch requesting a K-9

Unit from Border Patrol South Station in Eagle Pass.  While awaiting the border

patrol unit, Segura was handcuffed and seated in Sergeant Gonzalez's vehicle per

Eagle Pass Police Department policy.   Officer Ramirez then informed Sergeant

Gonzalez that although he could not be sure, he smelled marijuana around the

vehicle.

At the same time, Sergeant Gonzalez briefly questioned Saucedo

about where she was headed.  Saucedo answered that she had come from Segura's

house, was headed to a hotel, but had gotten lost.  Saucedo stated that there were

no narcotics, firearms, or currency over $10,000 in the vehicle.

While waiting for the Border Patrol K-9 unit, Sergeant Gonzalez

called the Maverick County Sherriff's Office at 11:17 p.m. to determine whether

the Maverick County Sherriff's Office K-9 Unit "Myra Ramos" was working.

Shortly thereafter, another officer, identified on the radio dispatch as

"Unit 466," contacted Eagle Pass Dispatch to relay information regarding the

status of the Border Patrol K-9 unit.  Sergeant Gonzalez then advised Dispatch of

his exact location to update the Border Patrol K-9 Unit.  Dispatch informed

Sergeant Gonzales that the Border Patrol K-9 Unit would arrive within three to

four minutes.

      At approximately 11:20 p.m., Maverick County Deputy Juan

Guardiola arrived with his K-9 Unit on scene.[1]  Sergeant Gonzalez informed

Deputy Guardiola that he had already called for another K-9 Unit, and it was on its

way to the scene.  Deputy Guardiola stated that he was en route to a sexual assault

call anyway and left the scene without deploying his canine.

      At approximately 11:33 p.m., about thirty minutes after the initial

stop, Border Patrol Officer Luis Olivas and his canine, Tommy-C, a Border Patrol

---

[1] Defendants assert that the Maverick County K-9 Unit arrived at 11:19 p.m.—two
minutes before the radio dispatch advised that the Border Patrol K-9 Unit was en
route.  (See Dkt. # 65 at 3; Dkt. # 67 at 2–3.)  However, the transcript of the video
reveals otherwise. According to the transcript, radio dispatch informed Sergeant
Gonzalez, "They advise [U/I] information.  They are just calling back at this time.
Try and get 10-4.  BP, you're on [U/I] what's your exact location by [U/I]?"
Sergeant Gonzalez responded, "Just advising that we're in front of O'Reilley's
almost at the intersection of, uh, Lewis and 1020 . . . in front of O'Reilley's. . . .
So . . . hey, tell me real fast, did he give you an ETA?"  Radio dispatch answered,
"10-4, ETA [estimated time of arrival] of about four to three minutes."  Then,
Sergeant Gonzalez asked Segura more information about where he was traveling to
and told him, "I have a K-9 that's coming [sic] that's going to run . . . dog, all
right?  As a matter of fact I have two of them.  One of them [the Maverick County
K-9 unit] just showed up."  Sergeant Gonzalez then stopped questioning Segura
and informed the Maverick County K-9 Unit that he is going to wait for Border
Patrol.  Thus, as the transcript readily reveals, radio dispatch informed Sergeant
Gonzalez that the Border Patrol K-9 Unit was en route before the Maverick County
K-9 Unit arrived.

K-9 Unit, arrived.  Officer Olivas asked Segura for consent to search the vehicle

with the canine, but Segura declined.  Officer Olivas then deployed his canine to

perform a free air sniff of the exterior of the vehicle.  At approximately 11:39 p.m.,

Tommy-C alerted to the bed of the truck for the presence of narcotics.

   After the positive alert for narcotics, Eagle Pass Officers and Officer

Olivas opened the bed cover of the truck to conduct a search of the vehicle at

around 11:44 p.m.  They immediately discovered three large bags containing

marijuana in the bed of the truck.  Upon inspection, the total gross weight of the

marijuana discovered in the truck was revealed to weigh approximately 135.2

kilograms.  After discovering the marijuana, Segura and Saucedo were handcuffed,

escorted to a patrol vehicle, and transported to the Eagle Pass Police station.

Officers later read them their rights.  Defendants agreed to waive their rights and

gave oral confessions to transporting the marijuana.

DISCUSSION

   Defendants argue that they were unlawfully detained for an

unreasonable amount of time in violation of the Fourth Amendment and that the

marijuana seized as a result of that unlawful detention must therefore be

suppressed.  (See Dkt. # 38 at 2; Dkt. # 39 at 5–6.)  The Government counters that

the initial stop was justified by reasonable suspicion and that the officers acted

6

diligently during the stop to confirm or dispel their reasonable suspicion that Defendants were involved in narcotics activity.  (See Dkt. # 42 at 10.)

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  "Traffic stops are considered seizures within the meaning of the Fourth Amendment." United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).  Courts analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Pack, 612 F.3d 341, 349–50 (5th Cir. 2010).

Pursuant to Terry, the legality of police investigatory stops is tested in two parts.  First, courts examine whether "the officer's decision to stop the vehicle was justified at its inception."  Id.  Second, courts examine "whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place."  Id.  The Government has the burden to prove reasonable suspicion under the Terry two-prong analysis when officers act without a warrant.  United States v. Gomez, 623 F.3d 265, 269 (5th Cir. 2010).

I.    <u>Whether the Decision to Stop Vehicle Was Justified at the Inception</u>

Defendants argue that the traffic infraction alone provided the reasonable suspicion to initially stop their vehicle.  (<u>See</u> Dkt. # 65 at 6; Dkt. # 67 at 4.)  "For a traffic stop to be 'justified at inception,' an officer must have an objectively reasonable suspicion that some variant of illegal activity . . . occurred before stopping the vehicle."  <u>United States v. Lopez-Moreno</u>, 420 F.3d 420, 430 (5th Cir. 2005).  The Court agrees that the traffic violation afforded reasonable suspicion to justify the initial stop.  Officer Ramirez witnessed Segura fail to stop at a clearly marked stop line, in violation of Texas Transportation Code § 544.007(d), and thus he had an objectively reasonable justification for initiating the stop.  <u>See id.</u>

However, according to the Government, Officer Ramirez had reasonable suspicion to stop Defendants' vehicle irrespective of the traffic violation because Officer Ramirez received an anonymous tip (conveyed to him by Detective Perez), and the tip was later confirmed by his observations.  (<u>See</u> Dkt. # 64 at 8–9.)  "Anonymous tips may provide the reasonable suspicion necessary to justify an investigatory stop."  <u>United States v. Perkins</u>, 352 F.3d 198, 199 (5th Cir. 2003); <u>see also</u> <u>Alabama v. White</u>, 496 U.S. 325, 332 (1990).  To determine whether the tip provides sufficient reasonable suspicion, courts consider: "(1) the credibility and reliability of the informant; (2) the specificity of the information

8

contained in the tip or report; (3) the extent to which the information in the tip or
report can be verified by officers in the field; and (4) whether the tip or report
concerns active or recent activity or has instead gone stale." United States v.
Martinez, 486 F.3d 855, 861 (5th Cir. 2007).  "If a tip is provided by
an anonymous informant, such that the informant's credibility and reliability
cannot be determined, the Government must establish reasonable suspicion based
on the remaining [three Martinez] factors." Id.

       In Alabama v. White, the Supreme Court considered under what
circumstances an anonymous tip can create reasonable suspicion.  496 U.S. at 331.
In that case, police received an anonymous phone call stating that a woman named
Vanessa White would be leaving 235–C Lynwood Terrace Apartments at a
particular time in a brown Plymouth station wagon with the right taillight broken.
Id. at 327.  The informant stated that White would go to Dobey's Motel and that
she would be in possession of about an ounce of cocaine inside a brown attaché
case.  Id.  The officers went to the Lynwood Terrace Apartments and saw a vehicle
matching the informant's description parked outside of the 235 building.  Id.  The
officers watched as a woman left the 235 building and entered the vehicle.  Id.  The
officers followed the vehicle as it drove the most direct route to Dobey's Motel,
and they stopped the vehicle just short of the motel.  Id.  The Court held that

because the anonymous informant's information had been confirmed by White's actions, the officers had reasonable suspicion to justify the stop.  Id. at 331.

The Supreme Court in Florida v. J.L., 529 U.S. 266 (2000), however, held that an anonymous informant's ability to describe a person's appearance and location is insufficient to create reasonable suspicion of criminal activity.  There, an anonymous informant called the police to report that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  Id. at 268.  The Court held that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."  Id. at 272 (emphasis added).  The Court distinguished White, recognizing that in J.L. the informant "provided no predictive information" to enhance the reliability of the assertion of illegality.  Id. at 271.

Since White and J.L., the Fifth Circuit has provided further guidance to determine under what circumstances an anonymous tip can furnish reasonable suspicion.  In United States v. Benavides, the Fifth Circuit held that a particular anonymous tip did not amount to reasonable suspicion because "the anonymous tip . . .[had] alleged no criminal activity."  291 F. App'x 603, 606 (5th Cir. 2008).  There, a caller reported that a pickup truck at a specific address was carrying large wooden crates and that two individuals were loading the crates with packages or bundles.  Id. at 604.  The caller also provided a detailed description of the pickup

truck, including its license plate number. Id. However, the caller did not provide any information as to the possible contents of the bundles, and the officer answering the caller did not obtain any information about the caller's location or source of knowledge. Id. Because the tip "merely described the truck, the truck's location, and the fact that the truck was being loaded with unknown cargo," the court held that the tip alone was insufficient under J.L. for a finding of reasonable suspicion. Id. at 606.

Likewise, in Martinez, the Fifth Circuit held that reasonable suspicion did not exist because the anonymous tip lacked any information linking the defendant to criminal activity. 486 F.3d at 863. There, law enforcement in Houston received a tip that a man named "Angel" might have been a witness to a quadruple homicide, might be in possession of the weapons used in the homicide, and might be planning to flee to Mexico with those weapons. Id. at 858. The tipster stated that Angel was staying with his girlfriend, and provided her address in Pasadena, Texas. Id. Based on this information, the officers conducted surveillance outside of the address. Id. On appeal, the court held that the officers lacked reasonable suspicion because they had no verifiable predictive information about the defendant's future behavior that would have indicated that criminal activity was afoot. Id. at 863.

On the other hand, in United States v. McKnight, the Fifth Circuit held that reasonable suspicion had existed because the informant gave specific predictive information, which enhanced the reliability of the tipster's assertion of illegality. 469 F. App'x 349 (5th Cir. 2012) (per curiam).  In McKnight, the informant stated that the defendant would be transporting illegal narcotics.  Id. at 350.  The informant identified the defendant by name and race, gave a specific description of the vehicle he would be driving, and stated that it was a black and brown two-toned, two-wheel drive Chevrolet truck with an extended cab and chrome rims.  Id.  Additionally, the informant also provided predictive information about what the defendant would be doing that day.  Id. at 355.  The informant said that the defendant would be driving in the Chevrolet truck between Rosedale and Mound Bayou and the officers were able to verify this portion of the tip: a black man in the truck described was driving on a route between Rosedale and Mound Bayou.  Id.  Because the informant furnished specific information—including information suggesting that the defendant was engaged in illegal activity by transporting narcotics—and that information was corroborated by officers on the field, the anonymous tip created reasonable suspicion.  Id.

Here, reasonable suspicion existed justifying the stop of Defendants' vehicle because the information given by the anonymous informant more closely resembles the situation in White, rather than J.L.  This is especially true in light of

12

the fact that the anonymous tip satisfies three of the four <u>Martinez</u> factors.  <u>See</u>

<u>Martinez</u>, 486 F.3d at 481.  First, the tip was received by Detective Perez

approximately one hour before Officer Ramirez observed Defendants.  Second,

there was substantial specificity of the information provided to Detective Perez

from the anonymous caller.  The tip advised that a male driver would be carrying

narcotics in a maroon Ford F-150 pick-up truck with gold trim and a tailgate cover

and would be traveling from the Loma Bonita area of Eagle Pass between 10:00

p.m. and midnight.  Third, the specific information was later corroborated by

Officer Ramirez as he observed a male driving a maroon F-150 pick-up truck with

gold trim and a tailgate cover coming from the Loma Bonita area of Eagle Pass

shortly before 11:00 p.m.  Given that the tip concerned recent activity, was

sufficiently specific, and was later corroborated by Officer Ramirez in the field, the

Court finds that reasonable suspicion existed to justify the stop to investigate

Defendants' narcotics transport.

        The tip was also reliable in its assertion of criminal activity; it did

more than simply identify a particular person, and thus the additional concern in

<u>J.L.</u> is not present under the instant set of facts.  Unlike in <u>Benavides</u> and <u>Martinez</u>,

the anonymous tip in the instant case provided predictive information about

Defendants' future behavior of driving a particular vehicle during a particular time

span in a particular area <u>and</u> contained information of the specific illegal activity—

13

the transportation of illegal narcotics.  The tipster here did more than merely

identify the physical description and location of the truck.  Rather, as in <u>McKnight</u>,

the tip also contained predictive information about <u>where</u> the male driver in the

maroon F-150 would be traveling (i.e., coming from the Loma Bonita area of

Eagle Pass), and <u>when</u> the truck would be traveling (i.e., between the hours of 10

and 11 p.m.).  As a result of this predictive information, officers were able to

confirm these facts from the tip in the field: a maroon F-150 with gold trim and a

tailgate cover was coming from the Loma Bonita area of Eagle Pass at 11 p.m.

Such predictive information about future behavior, later confirmed by Officer

Ramirez in the field, demonstrated that the tipster had knowledge of concealed

criminal activity.  See <u>J.L.</u>, 529 U.S. at 272.  Thus, the anonymous tip conferred

sufficiently specific information to reliably predict that the male driver in the

maroon F-150 would be transporting narcotics.

   In conclusion, because both the traffic violation and the anonymous

tip created reasonable suspicion to stop Defendants' vehicle, the Court finds that

the stop was justified at its inception and the first prong of the <u>Terry</u> is satisfied.

II. <u>Whether Subsequent Actions Were Reasonably Related In Scope to the
Circumstances that Justified the Stop of the Vehicle</u>

   Defendants argue that the stop fails the second-prong of the <u>Terry</u> test

because the length of the detention was unreasonable.  (<u>See</u> Dkt. # 65 at 12–13;

14

Dkt. # 67 at 9–11.)  According to Defendants, the thirty-minute stop was
unreasonably extended beyond the scope of a routine traffic stop.  (Id.)

Under the second-prong of the Terry test, the question before the
Court is whether the officers' actions after legitimately stopping Defendants were
reasonably related to the circumstances that justified the stop, or to dispelling the
reasonable suspicion developed during the stop.  According to the Fifth Circuit, "a
detention must be temporary and last no longer than is necessary to effectuate the
purpose of the stop, unless further reasonable suspicion, supported by articulable
facts, emerges."  United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004).

Segura relies on United States v. Jenson, 462 F.3d 399 (5th Cir. 2006)
to argue that any detainment past 11:10 p.m., the time when the licenses returned
clear, was unconstitutional.  (See Dkt. # 38 at 2; see also Dkt. # 67 at 8.)  In
Jenson, the Fifth Circuit held that an officer unlawfully prolonged a detention
outside the scope of the traffic stop.  Jenson, 462 F.3d at 406.  A DPS trooper
observed the defendant speeding.  Id. at 402.  The trooper ran the defendant's
driver's license through a computer check, and the license came back clear.  Id.
After receiving a written warning, the trooper noted that the defendant became
nervous and talkative.  Id.  The trooper asked for consent to search the vehicle, to
which the defendant gave consent.  Id.  The trooper then located a "two-shooter"
gun on the defendant, who was later arrested for being a felon in possession of a

firearm.  Id.  On appeal, the Fifth Circuit held that the purpose of the stop had

ended once the license had been cleared and that any prolonged questioning after

the license returned clear violated the Fourth Amendment.  Id. at 404.

Similarly, Saucedo relies on United States v. Macias, 658 F.3d 509

(5th Cir. 2011), wherein the Fifth Circuit concluded that a Texas DPS officer

unconstitutionally prolonged the defendant's detention by asking irrelevant and

unrelated questions without reasonable suspicion of criminal activity.  (See Dkt.

# 65 at 11–12.)  There, after being stopped for failure to wear a seatbelt, the

defendant told the trooper that he did not have insurance for the vehicle, but that

the vehicle belonged to his girlfriend, who had insurance.  Macias, 658 F.3d at 512.

The trooper questioned the defendant about his employment, criminal history, and

destination for eleven minutes.  Id. at 513–14.  The trooper then ran checks on the

vehicle and issued citations for failure to wear a seatbelt and no proof of insurance,

but then continued questioning the defendant about whether he would consent to a

search of the vehicle.  Id. at 515.  After obtaining consent, the trooper searched the

vehicle approximately thirty minutes after the traffic stop had been initiated.  Id.

The trooper eventually located an unloaded firearm and ammunition and arrested

the defendant for being a felon in possession.  Id.  The Fifth Circuit held that the

continued detention went beyond the permissible scope of the stop.  The court

reasoned that the extensive questioning, unrelated to the questioning regarding the

16

initial traffic stop, impermissibly extended the duration of the stop and did not demonstrate that the trooper diligently pursued a means of investigation that was likely to confirm or dispel his suspicion quickly. Id. at 518–22.

Here, however, neither Jenson nor Macias is on point. Both cases lack a key fact that is present in the instant case: the anonymous tip conferring information about the make, model, and physical description of Defendants' vehicle, as well as the time of day the vehicle would be traveling, the area the vehicle would be traveling in, the possible narcotics activity. As outlined above, the reasonable suspicion for the stop was not only predicated on the traffic violation, but also on the anonymous tip. Had the officers only had reasonable suspicion for the traffic violation, Defendants are correct in concluding that that reasonable suspicion would have dissipated once the licenses returned clear. See United States v. Santiago, 310 F.3d 336, 341–42 (5th Cir. 2002) ("Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave."). But because the anonymous tip gave Officer Ramirez reasonable suspicion for the stop to investigate possible narcotics activity, the permissible length of the detention exceeds the length permitted for investigating traffic stop alone.

17

Nevertheless, even under Defendants' theory that the traffic stop alone provided the reasonable suspicion for the initial stop, the Court finds that the detainment did not violate the second-prong of the Terry doctrine because the officers developed reasonable suspicion of additional criminal activity.  As the Fifth Circuit explained in Pack,

> An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime.  If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion.

612 F.3d at 350 (internal citations omitted) (emphasis added); see also Santiago, 310 F.3d at 342 (holding that after a computer check is completed for the traffic violation investigation, a driver should normally be free to leave unless the officer develops reasonable suspicion that an additional crime has been or is being committed); United States v. Valdez, 267 F.3d 395, 398 (5th Cir. 2001) ("[O]nce an officer's suspicions have been verified or dispelled the detention must end unless there is additional[,] articulable reasonable suspicion.").  "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new

reasonable suspicion has been dispelled or confirmed." Lopez-Moreno, 420 F.3d at 431.

Here, even assuming that the traffic violation alone predicated the initial stop, Officer Ramirez developed additional reasonable suspicion of criminal activity, namely the narcotics transport, prior to Dispatch confirming that Defendants' licenses returned clear.  For example, Segura initially did not comply with Officer Ramirez's request for his license, instead providing his passport card. After Officer Ramirez again asked him for his driver's license, Segura then complied.  Officer Ramirez then noted that Segura would not make eye contact with him and was "really shaky."   See Brigham, 382 F.3d at 504–05 (additional reasonable suspicion developed when the defendant driver was extremely nervous, avoided eye contact, and had a pattern of answering the officer's questions with questions of his own).  While speaking with Segura, Saucedo volunteered her driver's license.  Officer Ramirez testified that Saucedo appeared nervous and that a passenger volunteering identification was out of the ordinary for a normal traffic stop.  See Pack, 612 F.3d at 362 (finding that the defendant's extreme nervousness, irreconcilable stories, and location of the stop "created reasonable suspicion that additional criminal activity was afoot").

In addition to these seemingly odd behaviors, Officer Ramirez observed Segura coming from the Loma Bonita area of Eagle Pass driving a

maroon F-150 with gold trim and a tailgate cover at 11 p.m.— observations that confirmed the information relayed from the anonymous tip about the transport of narcotics.  Thus, even assuming the traffic violation was the only basis for the initial stop, Defendants' unusual nervousness, combined with the information concerning the transport of narcotics from the anonymous tip, created reasonable suspicion of <u>additional</u> criminal activity beyond the traffic violation.[2]

Having found that the officers were permitted to extend the duration of the stop beyond the length needed to investigate the traffic violation, the Court now examines the reasonableness of the entire length of detention.  Segura argues that Sergeant Gonzalez had "no legitimate reason" for wanting to wait for the Border Patrol K-9 Unit, and that "[w]hen Sergeant Gonzalez waived off the Maverick County Sheriff's K-9 Unit, he was not 'diligently' pursuing his investigation, nor was he making an attempt to limit the duration of the stop." (Dkt. # 67 at 11.)  Segura posits that had Sergeant Gonzalez not waived off the Maverick County K-9 Unit, the duration of the stop would have been shorted by more than twenty minutes.  (<u>Id.</u> at 10.)

"There is . . . no constitutional stopwatch on traffic stops."  <u>Brigham</u>, 382 F.3d at 511.  Instead, the relevant question when assessing whether a detention

---

[2] The Court also notes that Officer Ramirez noted the smell of marijuana only a few moments after Dispatch confirmed that Defendants' driver's licenses returned clear.

extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)); see also United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988) ("[T]he most important factor [for courts to consider] is whether the police detained [the defendants] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference."). Although brevity is an important factor in determining the reasonableness of a detention, courts must also consider the purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. United States v. Place, 462 U.S. 696, 709 (1983).

Sergeant Gonzalez testified that he waited for the Border Patrol K-9 Unit for several reasons. First, he testified, and the transcript reveals, that when Deputy Guardiola of the Maverick County K-9 Unit arrived, Gonzalez had already received confirmation from Eagle Pass Dispatch that the Border Patrol K-9 Unit was en route to Gonzalez's location. Dispatch informed him that the Border Patrol K-9 Unit was estimated to arrive within three to four minutes. Furthermore, Sergeant Gonzalez testified the Deputy Guardiola indicated that he had been previously dispatched to a sexual assault call prior to stopping by the scene of the traffic stop. And lastly, Sergeant Gonzales testified that he was aware of a

21

"rumor" regarding the certification of Guardiola's canine and thus had concerns about using that particular K-9 Unit to investigate Defendants' narcotics activity.[3]

Given these three reasons, the Court cannot say that Sergeant Gonzalez engaged in an unreasonable delay.  To the contrary, Sergeant Gonzalez immediately requested the Border Patrol K-9 Unit as soon as Segura declined consent to search the vehicle.  See Pack, 612  F.3d at 361 (reasonableness of detention was aided by the fact that the officer "initially tried to resolve his suspicion by requesting permission to search the vehicle," but when the defendant denied him permission, the officer "immediately called for a canine unit").  Additionally, Gonzalez's concerns about the Maverick County K-9 Unit were reasonable given that the potentially uncertified K-9 Unit could have erroneously alerted to narcotics.

In addition to finding that the police diligently pursued their narcotics investigation, the Court finds that the entire detention length of approximately thirty-five minutes[4] was reasonable.  See Pack, 612 F.3d at 361 (holding that thirty-five minute delay from initial detention to discovery of marijuana in waiting for a K-9 Unit was reasonable); LeMense v. State, 754 P.2d 268 (Alaska Ct. App.

---

[3] Sergeant Gonzalez requested the K-9 Unit "Myra Ramos"—not Deputy Guardiola's K-9 Unit—from the Maverick County.

[4] Officer Ramirez stopped Defendants at approximately 11:05 p.m.  The Border Patrol K-9 Unit alerted to the presence of narcotics at approximately 11:39 p.m.

1988) (thirty-minute detention to allow dog sniff of luggage not unreasonable);

State v. Nugent, 504 So. 2d 47 (Fla. Dist. Ct. App. 4th Dist. 1987) (wait of

one-half hour for drug-detecting dog to arrive did not convert detention into arrest).

Numerous courts have upheld the reasonableness of a detention for periods lasting

much longer than thirty-five minutes.  See, e.g., Lopez-Moreno, 420 F.3d at 433–

34 (finding that one hour detention was reasonable to allow Spanish-speaking

agent to arrive when officer reasonable suspected that the defendant was alien

smuggling); United States v. Hardy, 855 F.2d 753 (11th Cir. 1988) (wait of fifty

minutes for drug detection dog to arrive was not unreasonable); United States v.

Alpert, 816 F.2d 958 (4th Cir. 1987) (fifty-minute delay while waiting for dog sniff

to take place was not unreasonable); People v. Dyer, 490 N.E.2d 237 (Ill. 5th Dist.

1986) (twenty-minute to one-hour period during which officer stopped defendant

to investigate robbery was not too long in duration to qualify as investigatory stop).

          Accordingly, because the stop was justified at its inception and the

length of detention was reasonably related to the circumstances that justified the

stop, the stop and detention did not violate the Fourth Amendment.

                                   CONCLUSION

          Based on the foregoing reasons, the Court **DENIES** Defendants'

Motions to Suppress (Dkt # 38; Dkt. # 39).

                    **IT IS SO ORDERED.**

                                        23

**DATED:**  Del Rio, Texas, January 6, 2014.

_____

David Alan Ezra
Senior United States Distict Judge